**GEORGIA STATE CONFERENCE OF the NATIONAL ASSOCIATION for the ADVANCEMENT of COLORED PEOPLE, Coalition for the Peoples' Agenda, and Craig Murphy, Plaintiffs,**

v.

**Brian KEMP, in his official capacity as Secretary of State of the State of Georgia and Clyde L. Reese, in his official capacity as Commissioner of the Georgia Department of Human Services, Defendants.**

**Civil Action No. 1:11–CV–1849–CAP.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 30, 2012.

Brenda Wright, Lisa J. Danetz, Demos:
A Network of Ideas & Actions, Brighton,

MA, Neil Alan Steiner, Dechert LLP, New York, NY, Niyati Shah, Project Vote, Mark A. Posner, Robert A. Kengle, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Moffatt Laughlin McDonald, Nancy Gbana Abudu, American Civil Liberties Union Foundation, Atlanta, GA, for Plaintiffs.

Julia B. Anderson, State of Georgia Law Department, Atlanta, GA, for Defendants.

## ORDER

CHARLES A. PANNELL, JR., District Judge.

This case is before the court on the defendants' motion to dismiss the amended complaint [Doc. No. 25].

Initially, the plaintiffs have filed an amended complaint, which supersedes and abandons the original complaint. *Pintando v. Miami–Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir.2007). The defendants' motion to dismiss the original complaint [Doc. No. 14] and motion for oral argument filed in conjunction therewith [Doc. No. 15] are DISMISSED as moot.

## I. Introduction

With the express purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "protect[ing] the integrity of the electoral process," 42 U.S.C. § 1973gg(b)(1), (3), Congress passed the National Voter Registration Act of 1993 ("the NVRA"). The plaintiffs here claim that the State of Georgia has violated the mandates of the NVRA.

The two organizational plaintiffs in this case, Georgia State Conference of the National Association for the Advancement of Colored People ("GNAACP") and Coalition for the Peoples' Agenda ("Peoples' Agen-

da"), are groups claiming they have had to take action to mitigate problems caused by Georgia's failures under the NVRA. Craig Murphy is an individual claiming he was not offered the forms required by the NVRA in conjunction with his contacts with public assistance offices. As the Secretary of State, Defendant Kemp is the chief elections official in Georgia, and Defendant Reese, as Commissioner of the Georgia Department of Human Services ("DHS") oversees public assistance programs in Georgia.

The NVRA, also known as the Motor Voter Act, requires states to establish procedures to register to vote in three principal ways: in conjunction with applying for a driver's license, by mail, and through certain state offices. At issue here is the NVRA provision requiring states to name all public assistance offices as voter registration agencies ("VRAs") and distribute certain forms through them.

O.C.G.A. § 21–2–222, Georgia's statute implementing this provision, designates the food stamp; Medicaid; Women, Infants, and Children; and Temporary Assistance for Needy Families programs as VRAs for the purposes of Georgia's implementation of the NVRA. The amended complaint claims that the State of Georgia is violating the NVRA in that these public assistance VRAs have broadly failed to satisfy the mandates of Section 7, including by (1) failing to provide voter registration applications or services at their physical locations; (2) implementing official policies of discontinuing to offer voter registration forms or services to public assistance clients who have previously declined to register to vote; and (3) failing to provide voter registration forms to public assistance clients who contact them remotely (e.g. via telephone, internet, or the mail). The amended complaint contains a single count for violation of Sec-

tion 7 of the NVRA, codified at 42 U.S.C. § 1973gg–5, and requests declaratory and injunctive relief plus costs including attorney fees.

For factual support of their claim of comprehensive noncompliance with the NVRA, the plaintiffs allege statistics showing a precipitous decline in voter registration effectuated through Georgia's public assistance VRAs over the last fifteen years. The amended complaint also includes the results of an investigation conducted by or on behalf of the plaintiffs wherein public assistance clients were interviewed after visits to the public assistance VRAs. According to the complaint, "[N]one of the [public assistance] offices visited by the investigators in September 2010 included a voter registration form with the benefits application, and eight of the eleven offices could not even provide a voter registration application upon request" [Doc. No. 20 ¶ 29]. The September 2010 survey results also showed,

> [A]mong the [public assistance] clients interviewed after completing NVRA-covered transactions . . ., 44 of 50 reported that they were not offered voter registration; almost none of the 50 had been provided a voter preference form; and none of the 23 [public assistance] clients who had met with a caseworker during their visit to the [public assistance] office had been offered the opportunity to register to vote by the caseworker.

[*Id.* ¶ 30].

The defendants have moved to dismiss the complaint on for lack of proper pre-suit notice under the NVRA, lack of standing, and mootness. They have also moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The United States has filed a statement of interest in support of the plaintiffs' case, which the court has read and considered [Doc. No. 39].

The motion to dismiss the amended complaint is granted in part and denied in part. It is granted as to Plaintiff Murphy because he did not provide sufficient pre-suit notice under Section 11 of the NVRA. It is denied as to GNAACP and Peoples' Agenda; they each satisfied the requirements of the pre-suit notice provision, have standing, have stated a claim for which relief can be granted, and their claim is not moot.

■ Jurisdictional questions must generally be addressed prior to addressing the merits of a party's claims. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir.2009). Nevertheless, because an introduction to the NVRA and the plaintiffs' claim thereunder is so intertwined with the merits portion of the defendants' motion to dismiss, the court will first present analysis of the merits for the sake of clarity and concision. The court will then present analysis of the remainder of the motion to dismiss, including sufficiency of pre-suit notice, standing, and mootness.

## II. Section 7 and O.C.G.A. § 21–2–222

The plaintiffs claim that Georgia has failed to comply with Section 7 of the NVRA both by implementing legislation that contradicts its terms and by failing in the execution of measures necessary to meet its requirements. The defendants have moved to dismiss for failure to state a claim upon which relief can be granted. The defendants argue that the legislation Georgia passed to implement Section 7, which is codified at O.C.G.A. § 21–2–222, is in complete compliance. The plaintiffs disagree.

In relevant part, Section 7 of the NVRA provides:

(4) (A) At each voter registration agency, the following services shall be made available:

(i) Distribution of mail voter registration application forms in accordance with paragraph (6).

(ii) Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.

(iii) Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

. . .

(6) A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall—

(A) distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—

(i) the mail voter registration application form described in section 1973gg–7(a)(2) of this title, including a statement that—

(I) specifies each eligibility requirement (including citizenship);

(II) contains an attestation that the applicant meets each such requirement; and

(III) requires the signature of the applicant, under penalty of perjury; or

(ii) the office's own form if it is equivalent to the form described in section 1973gg–7(a)(2) of this title, unless the applicant, in writing, declines to register to vote;

(B) provide a form that includes—

(i) the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(ii) if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iv) the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

(v) the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C) provide to each applicant who does not decline to register to vote the

same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

42 U.S.C. § 1973gg–5(a). Meanwhile, the Georgia implementing statute provides, in relevant part,

(f) A designated voter registration agency that provides service or assistance in addition to conducting voter registration shall:

(1) Distribute with each application for such service or assistance and with each recertification, renewal, or change of address form relating to such service or assistance, when such application, recertification, renewal, or change of address is made in person, the mail voter registration application form provided for in Code Section 21–2–223 unless the applicant declines in writing to register to vote;

(2) Distribute a form provided by the Secretary of State to accompany the voter registration application form which includes:

(A) The question "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(B) If the agency provides public assistance, the statement "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(C) Boxes for the applicant to check to indicate whether the applicant is presently registered, would like to register, or declines to register to vote with the statement "IF YOU DO NOT CHECK ANY BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REG-ISTER TO VOTE AT THIS TIME." in close proximity to the boxes and in prominent type;

(D) The statements "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application in private."; and

(E) The statement "If you believe that someone has interfered with your right to register or to decline to register to vote or your right to privacy in deciding whether to register or in applying to register to vote, you may file a complaint with the Secretary of State at (insert address and telephone number)."; and

(3) Provide to each applicant who does not decline to apply to register to vote the same degree of assistance with regard to the completion of the voter registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

(g) If an applicant fails to check any box on the form required by subparagraph (f)(2)(C) of this Code section, the applicant shall be deemed to have declined to apply to register to vote.

O.C.G.A. § 21–2–222.

The plaintiffs claim that, through these subsections, the State of Georgia has impermissibly limited the scope of Section 7. Specifically, the plaintiffs argue that NVRA Section 7 requires Georgia to distribute voter registration application forms with all applications, recertifications, and renewals of assistance and with all change of address forms, including those that are provided through remote means by DHS.

In addition, they claim that O.C.G.A. § 21–2–222(g) impermissibly requires that those who do not check a box on the voter preference form required under § 21–2–222(f)(2) must be deemed to have declined to register to vote for all purposes, while Section 7 subparagraph (a)(6)(B)(iii) merely relieves the public assistance office of the requirement of offering assistance filling out the voter registration form in such a situation. The plaintiffs contend that the consequence of this provision of the Georgia statute is to require public assistance clients to "make an affirmative request for a registration application (by checking the "yes" box) in order to receive one" [Doc. No. 35, p. 23]. The defendants maintain that Georgia's implementing statute is in complete compliance with Section 7.

### A. Motion to dismiss standard under Rule 12(b)(6)

A Rule 12(b)(6) motion requires an assessment of whether the plaintiff has set forth claims upon which this court may grant relief. In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and construes the complaint in the plaintiff's favor, *Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir.1993). A complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations:

[A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief"

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Ultimately, the complaint is required to contain "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim," but a complaint must also "provide the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). A pleading that offers mere labels and conclusions or a formulaic recitation of the elements of a cause of action is subject to dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

### B. Analysis

### 1. NVRA requirements with regard to remote public assistance transactions

The defendants maintain that Section 7 cannot be read to require the State of Georgia to provide voter registration applications to public assistance clients unless those clients appear in person at one of the public assistance offices.[1]

---

1. Initially, the defendants also argue that it is not evident from the face of the amended complaint that the plaintiffs are maintaining a cause of action based specifically on Georgia's failure to provide voter registration forms and services in conjunction with remote public assistance transactions. This position is not availing.

The amended complaint contains a single count based on the alleged widespread and

systematic violation of the NVRA. It alleges that Georgia "fail[s] to ensure that all clients who apply, recertify, renew, or change an address in connection with public assistance benefits be provided with a voter preference form, a voter application form, and assistance in completing a voter application form" [Doc. No. 20 ¶ 25]. Additionally, according to the amended complaint, "Sections 7's voter registration requirements (including the

Appropriate analysis of questions of statutory interpretation begins with the plain language of the statute. *Jimenez v. Quarterman*, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009). "It is well established that, when the statutory language is plain, [the court] must enforce it according to its terms." *Id.* "Unless there is some ambiguity in the language of the statute, a court's analysis must end with the statute's plain language." *Nyaga v. Ashcroft*, 323 F.3d 906, 914 (11th Cir.2003). Nonetheless, courts must also fit all parts of a statute "into an harmonious whole," if possible, *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), and, "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dept. of Treas.*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). *See also, King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (stating, "[T]he meaning of statutory language, plain or not, depends on context.").

At bottom, the language of paragraph (a)(6) of Section 7 is unambiguous: state public assistance offices designated as VRAs are required to "distribute with **each** application for such service or assistance, and with **each** recertification, renewal, or change of address form" a mail voter registration application form and a voter preference form. 42 U.S.C. § 1973gg–5(a)(6) (emphasis added). The plain meaning of this statement is clear: if an assistance office supplies an application for assistance, it must, without limitation, also distribute a voter registration form

and a voter preference form. There is no clear textual basis in the operative language of Section 7 paragraph (a)(6) for the proviso found in the Georgia statute implementing the NVRA, which limits the application of the mandatory distribution of forms to only those instances "when such application, recertification, renewal, or change of address is made **in person.**" O.C.G.A. § 21–2–222(f) (emphasis added). To sustain Georgia's position, the court would be forced to ignore the ordinary meaning of the plain language of Section 7 paragraph (a)(6), and the court declines to do so. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (declining to read in an exception to the Endangered Species Act where the "language admits of no exception").

The defendants' contextual argument in favor of reading an in-person limitation into Section 7 paragraph (a)(6) is largely based on Section 4 of the NVRA. That section provides in relevant part:

(a) In general

Except as provided in subsection (b) of this section, notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office—

(1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 1973gg–3 of this title;

(2) by mail application pursuant to section 1973gg–4 of this title; and

(3) by application **in person**—

requirements regarding distribution of registration forms and voter preference forms, and the provision of assistance in completing a registration form) apply ... to clients whose applications for public assistance, re-

newals or recertifications, or changes of address are processed entirely through remote transactions (e.g., telephone, mail, or internet)." [*id.* ¶ 18]. Thus the complaint clearly incorporates the issue of remote transactions.

(A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 1973gg–5 of this title.

42 U.S.C. § 1973gg–2 (emphasis added).

According to the defendants' view of the text, Section 7 must be read to be consistent with the NVRA as a whole, which requires the court to read the in-person language of Section 4 into the mandates of Section 7. They argue:

Section 4 lays out the general rule created by the NVRA: All states, except those exempted, must offer voter registration forms in three new ways, (1) when applying for a drivers' license, (2) by mail under certain conditions, and (3) when applying in person at certain government offices. Section 4 also requires states to establish procedures to implement those requirements. Section 7 provides a more granular level detail as to how the third manner of voter registration from Section 4 shall be effectuated. The sections are not addressing different actions—they are discussing the same event, and as such must be read together.

[Doc. No. 37, pp. 13–14].

This reading simply misstates Section 4's mandates. Contrary to the defendants' assertion, Section 4 does not deal principally with the way in which states must offer voter registration forms. A plain reading instead requires the establishment of procedures for voter registration. In the case of VRAs such as those at issue in the present case, it requires the establishment of "procedures to register to vote . . . by application in person" at the VRAs. It says nothing of the manner in which voter registration forms or voter preference forms must be distributed or provided.

Section 7 paragraph (a)(6) regulates those forms. Section 4 simply regulates a different requirement under the NVRA.

In their next attempt to read an in-person limitation into the text of Section 7 paragraph (a)(6), the defendants point out several words and phrases they claim lend support to their position. They highlight paragraph (a)(2), which requires that each state designate "all **offices** in the state that provide public assistance" as voter registration agencies. 42 U.S.C. § 1973gg–5(a)(2)(A) (emphasis added). In addition, they point out that subparagraph (a)(4)(A) lists certain required services (such as distribution of mail voter application forms in accordance with paragraph (6)) that must be made available "[a]t each voter registration agency." 42 U.S.C. § 1973gg–5(a)(4)(A) (emphasis added). Also, the defendants point out that the voter preference form required under subparagraph (a)(6)(b) must contain the question, "If you are not registered to vote where you live now, would you like to apply to register to vote **here** today?" § 1973gg–5(a)(6)(B) (emphasis added). Finally, the defendants point out that the privacy control provision of Section 7 contains the language, "No information relating to a declination to register to vote in connection with an application made **at an office** described in paragraph (6) may be used for any purpose other than voter registration." § 1973gg–5(a)(7) (emphasis added).

According to the defendants, each of the words and phrases highlighted above indicates that Congress contemplated the states implementing a new agency-based voter registration scheme that was to take place only at the physical locations of the various VRAs. Following this argument, the services these registration agencies are required to provide are limited to those that can take place in person. The defen-

dants conclude that, based on the indications in the above language, they are not required to distribute voter registration applications to public assistance clients unless they apply in person.

These words and phrases do not compel the inference that Congress intended to limit the applicability of paragraph (a)(6) to in-person transactions conducted at the physical location of the assistance offices. Even if Congress did intend to limit applicability of paragraph (a)(6), courts are bound to interpret statutes as they are written, not based on what was intended but not expressed. Here, Congress did not impose express locational or in-person limitations on the mandates of Section 7 paragraph (a)(6). Accordingly, the court will not infer from ambiguous words such as "here" or phrases such as "at an office" in other provisions a limitation that these words and phrases do not demand and that would contradict the plain language of Section 7 paragraph (a)(6).

This is especially true where, as here, Congress expressly chose to limit the mandates of other portions of the NVRA such as the requirement in Section 4 requiring states to establish procedures "to register to vote ... by application in person" at VRAs. As noted above, Section 4 paragraph (a)(3) regulates different activities (i.e., how voter registration applications are accepted) than Section 7 paragraph (a)(6) (i.e., the distribution or provision or certain forms). These activities are simply treated differently by the NVRA. The court is bound to respect these different treatments by limiting the applicability of the former and declining to infer a limit where Congress chose not to include one in the latter. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 222, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991).

Even if the words and phrases highlighted by the defendants did make the man-dates of Section 7 ambiguous or otherwise muddy the waters, dismissal would still be inappropriate in light of congressional findings and the purposes and legislative history of the NVRA. First, Congress included the following in the text of the NVRA:

The Congress finds that—

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

42 U.S.C. § 1973gg(a). It is apparent that Congress, concerned with discriminatory and unfair registration procedures, implemented the NVRA to deal with state laws and practices it deemed problematic. The plaintiffs' reading of Section 7 paragraph (a)(6) in the context of the whole NVRA serves to mitigate these concerns by ensuring access for public assistance clients to the appropriate forms no matter how they contact the public assistance offices. Similarly, this reading undoubtedly effectuates the express purposes of the NVRA, including "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "protect[ing] the integrity of the electoral process." See 42 U.S.C. § 1973gg(b)(1), (3). To read Section 7 paragraph (a)(6) to cover only in-person transactions, even as the defendants speculate, "Perhaps voter registrations have declined as a result of Georgia's limitation on NVRA services to in-person applicants as more applicants prefer to apply remote-

ly," [Doc. No. 25–1, p. 14], would conflict with these purposes.[2]

The legislative history of Section 7 confirms that Congress was concerned with providing as many eligible voters as possible with the opportunity to register. The House Conference Report for the NVRA expressed concern that a proposed amendment "would permit states to restrict their agency programs and defeat a principal purpose of this Act—to increase the number of eligible citizens who register to vote." H.R. Conf. Rep. No. 103–66, 1993 U.S.C.C.A.N. 140, 144, 1993 WL 235764 at *16.[3] The Conference Report explained that its rejection of the amendment would prevent states from excluding a "segment of [their] population[s] from those for whom registration will be convenient and readily available—the poor ... who do not have driver's licenses and will not come into contact with the other principle place to register under this Act." *Id.* It is evident that Congress' concern was to provide citizens eligible to register to vote with opportunities to register by utilizing state offices with which they were likely to have contact. The court declines to read in an artificial limit that would frustrate this purpose.

Finally the court notes that while Georgia has chosen not to implement procedures for distributing voter registration application forms to public assistance clients applying remotely, its legislature has been proactive in implementing procedures to register voters through offices that do not provide public assistance.

Specifically, in 2004, Georgia passed O.C.G.A. § 21–2–221.1. 2004 Ga. Laws 732. Its operative provision provides, in relevant part, "Each application to obtain a resident hunting, fishing, or trapping license ... shall also serve as an application for voter registration unless the applicant declines to register to vote through specific declination or by failing to sign the voter registration application." O.C.G.A. § 21–2–221.1. The court declines to speculate on the motives behind Georgia's choice to automatically convert applications for those wishing to hunt or fish in Georgia into voter registration applications and then fight the proposition that Georgia is required to merely offer voter registration applications to applicants for public assistance. The court will offer an observation, however: the NVRA expresses a policy of increasing the number of eligible citizens who register to vote and implements that policy by reaching a wide range of citizens through offices they are likely to contact, especially after a change of address. Georgia, however, seems to favor a less inclusive group of eligible citizens for voter registration. Though Georgia's unwritten policy is unclear at this point and may not be material to the outcome of this case, it may need reexamination.

The portion of the defendant's motion to dismiss based on the premise that remote public assistance transactions are not covered by the NVRA is DENIED.

**2. Voter preference form requirements**

■ Section 7 subparagraph (a)(6)(B) requires the distribution of another form

**2.** The court is mindful that "[i]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be law." *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 171, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007). Nevertheless where, as here, the statute's plain language is in accord with the purpose, this is not a concern.

**3.** The proposed amendment would have made agency-based registration through public assistance agencies discretionary instead of mandatory. The conference instead endorsed mandatory agency-based registration

in addition to the mail voter registration application. This form, referred to herein as a voter preference form, must contain boxes for the client to mark in order to indicate whether he or she would like to register or declines to register. The plaintiffs argue that the Georgia statute impermissibly interprets a client's failure to mark either box as a declination to register to vote for all purposes, while Section 7 subparagraph (a)(6)(B)(iii) only relieves the VRA of the necessity of assisting the client with filling out a voter registration form when no box is marked. The defendant argues that the language of the Georgia statute mirrors the language of the NVRA and therefore does not deviate substantively from Section 7.

While it is unclear to the court how the substantive consequences of the Georgia statute differ from those of Section 7, this matter can be addressed more thoroughly once a factual record is developed in this case. If, as the plaintiffs apparently argue, under O.C.G.A. § 21–2–222(g), the State interprets a blank response on the voter preference form as a declination to register to vote and therefore offers no voter registration application, Georgia policy likely runs afoul of Section 7. Nevertheless, because no factual record has been developed yet, the court declines to dismiss the plaintiffs' claim based on the defendants' arguments on this point.

## III. Notice and jurisdictional challenges

The defendants also claim they are entitled to dismissal on other, non-merits grounds. These include failure to file proper notice with the state prior to instituting this action, lack of standing, and mootness. The court will address each of these in turn.

## A. Notice under NVRA Section 11

The defendants argue that the pre-suit notice sent by GNAACP is inadequate under NVRA Section 11, 42 U.S.C. § 1973gg–9. Subsection (b) of that section provides, in relevant part, as follows:

(1) A person who is aggrieved by a violation of this subchapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1) ... the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

The defendants argue the notice provided in this case is inadequate for two reasons. First, they argue content of the notice letter is insufficient in that it failed to provide any specific information regarding the plaintiffs' investigation of eleven public assistance offices, which led to the notice and ultimately to this suit. In addition, the defendants argue the notice letter, sent by plaintiffs' counsel on behalf of GNAACP and the "eligible voters it represents[ ] and other similarly situated," [Doc. No. 20–1], is insufficient to confer standing upon Peoples' Agenda and Murphy.

### 1. Content of the notice letter

■ There is no doubt that the plaintiffs' January 25, 2011, letter provided sufficient notice of several categories of NVRA violations and therefore complied with NVRA Section 11. Even the defendants' brief admits:

[T]he NAACP's January 25, 2011 letter contained notice of three alleged violations of Section 7:

1. Georgia is systematically failing to provide the voter registration services

required under the NVRA at its public assistance offices[;]

2. O.C.G.A. § 21–2–222(f) does not comply with the NVRA because it limits voter registration services to in-person transactions; and

3. DHS' internal policies do not comply with the NVRA because they provide that once an applicant or recipient declined an offer to vote in writing the agency was no longer required to offer voter registration service.

[Doc. No. 25–1]. The defendants thus admit that they were informed of the plaintiffs' position that Georgia was failing to comply with the mandates of the NVRA in the broadest sense. Moreover, the defendants cite no authority for their assertion that the plaintiffs were required to turn over specific results of investigations or surveys conducted by or on behalf of the plaintiffs before bringing suit. The general proposition—that Georgia was not complying with the mandates of the NVRA, especially with respect to providing voter registration services at public assistance offices and having in place policies to limit any services actually provided to in-person transactions—is set out clearly in the notice letter. The letter's statistics and investigation results simply serve as factual support for that general proposition. The letter gives more than enough notice that a complete review of DHS practices was needed.

It is not sufficient to argue that the defendants "never were given an adequate basis upon which to investigate possible violations," as the defendants do in their brief [Doc. No. 25–1]. Nor is it adequate to assert that the information offered in the notice letter is not "evidence of a systemic failure" on the part of the State of Georgia [Doc. No. 25–3].[4] The letter asserts that of the offices visited for the survey, all either completely failed to offer voter registration services (8 of 11) or provided inadequate services (3 of 11) and that 88% of public assistance clients interviewed for the survey reported not having been offered registration when they should have been. The letter thus alleged not only widespread violations of the NVRA, it also gave concrete figures more than sufficient to support that claim. *See Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F.Supp.2d 845, 852 (D.Md.2001) (the comparatively conclusory allegation that a public assistance office "failed to provide voter registration services to its clients" was sufficient to comply with NVRA Section 11). Especially in light of statistics provided in the letter showing a precipitous decline in voter registration through Georgia public assistance offices over a 12–year period, the letter's content was adequate.

The content of the notice given in this case was sufficient under Section 11 of the NVRA.

### 2. Notice by Peoples' Coalition and Murphy

■ As noted above, the January 25, 2011, letter was sent by counsel "on behalf of [GNAACP], eligible voters it represents, and other similarly situated" [Doc. No. 20–1, p. 1]. Pretermitting whether this notice is sufficient on its face to include Peoples' Agenda as "similarly situated," the court is satisfied that no further notice was re-

---

4. The letter of counsel for DHS in response to the notice letter provides, "You also alleged that 'substantial evidence' exists demonstrating that the State of Georgia is 'systematically failing to provide voter registration services at its public assistance offices.' Although you referenced the difference in the number of voter registration applications in the years 1995–1996 and 2007–2008, **no other evidence of a systemic failure was provided.**" [Doc. No. 25–3, p. 2] (emphasis added).

quired to allow Peoples' Agenda to be a party to this suit.

The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation. *See Ass'n of Cmty. Orgs. for Reform Now v. Miller,* 129 F.3d 833, 838 (6th Cir.1997) (citing relevant legislative history, S.Rep. No. 103–6 (1993)). In *Miller,* Michigan's governor had issued an executive order declaring that state agencies would not provide voter registration services until federal funds were provided to fund the initiative. *Id.* at 835. Despite the fact that several plaintiffs had failed entirely to provide notice under Section 11 of the NVRA, the court refused to dismiss them as plaintiffs because requiring redundant notice where it was clear that no compliance was forthcoming amounted to a futile act. *Id.* at 838.

In their opposition to this suit, the defendants have made clear that they do not intend to provide voter registration services to public assistance clients except in person.[5] Just as the *Miller* court declined to require parties not named on the notice letter to send separate notice where it was clear from the circumstances that Michigan would not comply absent litigation, this court will not require such a futile act from Peoples' Agenda in order to participate in this case. *Miller,* 129 F.3d at 838.

■ The same cannot be said of Murphy, however. Murphy's particular situation was not made known to the defendants until they were served with the amended complaint in this suit. There are no allegations in the amended complaint that Murphy is a voter represented by

GNAACP or that he is somehow situated similarly to GNAACP so that the notice letter might have been sent on his behalf, according to its own terms. Apprised of this deficiency by the defendants' brief in support of the motion to dismiss [Doc. No. 25–1, p. 18], the plaintiffs' response failed to argue that he was somehow included in the notice letter. Moreover, the alleged injuries to Murphy, such as the lost convenience of applying for voter registration at a public assistance office and the entitlement to aid in registering to vote, are unique to Murphy himself. While the other plaintiffs, as shown below, have appropriately alleged standing (by diverting resources, etc.), he has alleged no separate basis for statutory standing other than these alleged injuries.

■ The plain language of Section 11 of the NVRA makes clear that pre-litigation notice is required. 42 U.S.C. § 1973gg–9. It confers standing on an party aggrieved only "[i]f the violation is not corrected within 90 days after receipt of a notice under paragraph (1)." 42 U.S.C. § 1973gg–9(b)(2). No standing is therefore conferred if no proper notice is given, since the 90–day period never runs. *See also Broyles v. Texas,* 618 F.Supp.2d 661, 692 (S.D.Tex.2009) (concluding that Section 11 notice is mandatory and that dismissal is proper if no proper notice is given). In this case, Murphy did not give the appropriate notice.

Moreover, the court is satisfied that Georgia has attempted to comply with Section 7 insofar as Murphy was aggrieved by the State's previous failures. This attempted compliance is evident from the

---

**5.** In the DHS response to the notice letter, the counsel for DHS made clear that it was the position of DHS that voter registration applications were not required to be distributed in conjunction with internet or telephone trans-actions (as opposed to in-person transactions) [Doc. No. 25–3, p. 3]. That is still the State of Georgia's position today, according to the defendants' reply brief [Doc. No. 37, pp. 12–15].

State's letter to Murphy's counsel, which included a voter registration application [Doc. No. 25–14]. This letter also offers the assistance of the Secretary of State's office [*id.* at 2]. Together, the letter and application appear to be more than an empty gesture. On the contrary, they represent the State of Georgia's attempt to comply with the NVRA with regard to Murphy. The pre-litigation notice was meant to encourage exactly this sort of compliance attempt. *Miller,* 129 F.3d at 838.

Accordingly, Murphy must be dismissed as a plaintiff pursuant to NVRA Section 11, 42 U.S.C. § 1973gg–9.

### B. Standing

■ The defendants have also moved to dismiss for lack of standing under Article III of the Constitution. "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." *Common Cause/Georgia v. Billups,* 554 F.3d 1340, 1349 (11th Cir.2009). "Each element of standing must by supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." *Id.*

■ Article III of the Constitution limits the authority of federal courts to adjudication of "Cases" and "Controversies." U.S. Const. art. III, § 2. In order to satisfy Article III standing requirements, the plaintiff first must have suffered (or face the prospect of suffering) an injury. *Common Cause/Georgia,* 554 F.3d at 1349. Second, the injury must have been caused by the defendant's actions. *Id.* Third, the

injury or threat thereof must be likely to be redressible by a favorable court decision. *Id.*

■ The defendants here contend only that the organizational plaintiffs allege no injury sufficient to satisfy the Article III standing requirement. "An injury sufficient for standing purposes is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* at 1350 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

■ GNAACP has alleged that (1) it and its members have expended additional resources—such as staff and volunteer time—on efforts to assist individuals with voter registration, (2) those individuals should have been offered voter registration services through Georiga's public assistance offices under the NVRA, (3) it reasonably anticipates this diversion of resources will continue based on the state's alleged continuing violations, and (4) these diverted resources would otherwise be spent on other activities of GNAACP, such as political forums, voter education workshops, and canvassing [Doc. No. 20 ¶¶ 45, 47]. Peoples' Agenda has made almost identical allegations [*id.* ¶¶ 49, 51].

These allegations plainly satisfy the injury prong of the Article III test for standing. In *Common Cause/Georgia,* where the record on appeal reflected that the NAACP,[6] a plaintiff, was "actively involved in voting activities and would divert resources from its regular activities" due to the defendants' alleged failures, it had established an injury sufficient to confer standing. 554 F.3d at 1350. This was because the NAACP could not bring to bear

---

6. The court notes that the plaintiff in this case is, according to the amended complaint, an unincorporated association affiliated with the NAACP, which was a plaintiff in *Common Cause/Georgia* [Doc. No. 20, p. 5].

limitless resources, and the diversion of its resources would cause its noneconomic goals to suffer. *Id.* at 1350–51; *see also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir.2008) (when a drain on organizational resources arises from the organization's need to counteract the defendants' allegedly illegal practices, that drain is another manifestation of the injury to the organization's noneconomic goals).

The organizational plaintiffs have sufficiently alleged injuries. Dismissal is inappropriate on standing grounds.[7]

### C. Mootness

The defendants also argue that the plaintiffs' claim is moot. Specifically, the defendants contend that the policies of two state public assistance programs were changed to remedy any shortcomings with regard to the NVRA.

 A mootness challenge is reviewed under Federal Rule of Civil Procedure 12(b)(1). *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308 (11th Cir.2011). "A case is moot when events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief." *Id.* When a case is no longer justiciable, that is, it no longer presents a live controversy with respect to which the court can give meaningful relief under Article III of the Constitution, the court has no jurisdiction to adjudicate the case. *Id.* at 1309.

 There is an important exception to this general rule of mootness. *Id.* "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). "[V]oluntary cessation of challenged conduct will only moot a claim when there is no 'reasonable expectation' that the accused litigant will resume the conduct after the lawsuit is dismissed." *Bd. of Regents*, 633 F.3d at 1309. Without this exception, a party could evade a challenge simply by changing its practice at the initiation of litigation only to reinstate the practice after dismissal of the litigation for mootness. *Id.*

 While generally the party asserting mootness bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again, ... government actors enjoy a rebuttable presumption that the objectionable behavior will not recur." *Id.* (quotations omitted). The Eleventh Circuit has "consistently held that a challenge to government conduct that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the government conduct will resume if the suit is terminated." *Id.* (quotation omitted).

 To determine whether a claim is moot within this framework, the court makes three inquiries. First, the court must consider whether the termination of the offending conduct was unambiguous. *Id.* Second, the court inquires into whether the change in government policy appears to be the result of substantial deliberation or is simply an attempt to manipulate ju-

---

**7.** The organizational plaintiffs also contend that they have associational standing to pursue their claims [Doc. No. 35, p. 11 n. 11]. Because the court concludes that the organizational plaintiffs have sufficiently pled standing as organizations, the court does not address whether associational standing was sufficiently pled. *See Common Cause/Georgia*, 554 F.3d at 1351.

risdiction. *Id.* Third, the court must inquire whether the government has consistently applied a new policy or adhered to a new course of conduct. *Id.*

 In this case, the defendants claim that a change in DHS policy has rendered the plaintiffs' claim moot insofar as it alleges that the defendants have systematically failed to provide voter registration applications and voter registration services through its public assistance agencies. For this proposition, the defendants rely on a memorandum on DHS letterhead [Doc. No. 25–12] and a printout of a form, apparently submitted electronically by the State to the Department of Justice, seeking pre-clearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973 et seq. [Doc. No. 25–13].

This evidence is insufficient under the first prong of the mootness test since the evidence tending to show cessation of the offending government conduct is not unambiguous. The memo from Rachelle Carnesdale, the Director of the Division of Family and Children Services, reveals several ambiguities. Although the memo's "Policy Clarification" section does appear to comport with some of the mandates of the NVRA, it is far from clear that all of the NVRA's mandates are addressed. For example, the defendants argue that the memo remedies a former DHS policy. Under that former policy, when an applicant or recipient of public assistance declined an offer to register to vote in writing, the agency was no longer required to offer voter registration services, including at subsequent visits to the public assistance office [Doc. No. 25–1, p. 19] (citing [Doc. No. 25–10, p. 4] ). While the memo does appear to remedy this apparent shortcoming in previous policy, it does not make clear that its new policy extends to

all public assistance offices in Georgia nor whether the changes are permanent. It states:

> [I]t appears that the voter registration policy for the TANF[8] program should be updated. When the TANF policy is updated, the voter registration policies for the Food Stamps and Medicaid programs **may** also need to be revised to ensure consistency. The purpose of this memorandum is to clarify DHS' obligations under the NVRA and to provide county DFCS offices with **interim** policy/guidance until the applicable programs policies can be updated in the Online Directives Information System (ODIS).

[Doc. No. 25–12] (emphasis added). The memo is thus ambiguous as to whether the new policy applies to public assistance offices other than TANF. *See* O.C.G.A. § 21–2–222(a)(2) (designating the food stamp, Medicaid, WIC, and TANF programs as VRAs). It is also clear that no final or official policy changes had been adopted; the memo states that it implements only an interim change. Finally, the memo references a form ("DS–2007") that must be given to applicants for public assistance, but does not attach that form for the court to review. The court therefore cannot pass on the adequacy of the form.

The DOJ pre-clearance receipt does not clarify these ambiguities [Doc. No. 25–13]. While the receipt does indicate that new policy statements were submitted to the DOJ, those policy statements were not submitted for the court to review; they were simply summarized on the receipt.

As noted above, the principal allegations supporting the plaintiffs' claim that the defendants have violated the NVRA are the results of a survey of clients of Geor-

---

8. Temporary Assistance to Needy Families.

gia's public assistance offices. These results showed that none of the 11 public assistance offices visited during the survey period in September 2010 included a voter registration form with the benefits application, and 8 of the 11 offices could not provide a voter registration application upon request [Amended Complaint, Doc. No. 20 ¶ 29]. Other survey or interview results showed that 44 of 50 clients were not offered voter registration, and none of the 23 clients who had met with caseworkers had been offered the opportunity to register to vote [*id.* ¶ 30].

While the defendants argue that the policy changes outlined in the memo and the DOJ receipt moot the controversy in this case, they overlook the systemic failures the plaintiffs have alleged in the amended complaint and supported with these factual allegations. Even if the policy changes were sufficient to moot any controversy regarding the previous DHS policies of not offering voter registration services to public assistance clients after the clients declined to register to vote one time, the scope of the controversy in this case is much broader. It encompasses both the alleged failure to provide voter registration applications in person at public assistance offices and, as shown *supra*, the requirement that a mail voter registration application be distributed with each application for assistance regardless of whether the application for assistance is made in person or remotely under Section 7 paragraph (a)(6).[9]

The defendants are entitled to no presumption of mootness in this case, and they have not otherwise shown that the court cannot render meaningful relief.

Accordingly, dismissal is improper on this ground.

## IV. Conclusion

The defendants' motion to dismiss the original complaint [Doc. No. 14] and motion for oral argument filed in conjunction therewith [Doc. No. 15] are DISMISSED as moot. The defendants' motion to dismiss the amended complaint [Doc. No. 25] is GRANTED as to Plaintiff Murphy and DENIED as to Plaintiffs GNAACP and Peoples' Agenda.

---

9. The plaintiffs also point out that, while DHS policy has changed going forward, DHS has not remedied its failure to provide voter registration applications and services to public assistance clients who were not offered applications or services while the offending policies were in place. Accordingly, the plaintiffs argue that there is a still a live controversy on this basis.